IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| HUNTER BANTA, Individually and on behalf of his minor son, I.B.,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>KEITH HAYASHI, ET AL.,<br><br>                    Defendants. | CIVIL NO. 23-00222 JAO-WRP<br><br>**ORDER AFFIRMING ADMINISTRATIVE HEARING OFFICER'S DECISION** |

## ORDER AFFIRMING ADMINISTRATIVE HEARING OFFICER'S DECISION

Plaintiffs Hunter Banta, individually and on behalf of his minor son, I.B. ("Plaintiffs"), bring this action against Keith Hayashi, Superintendent of the State of Hawaii Department of Education ("DOE") and Kenneth S. Fink, M.D., Director of the State of Hawaii Department of Health ("DOH"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act of 1973, and 42 U.S.C. § 1983. ECF No. 21. In relevant part, Plaintiffs seek reversal of the Findings of Fact, Conclusions of Law and Decision ("Decision") issued by the Administrative Hearing Officer ("AHO") on April 26, 2023 in DOE-SY2223-023. After careful consideration of the parties' briefs, the applicable law, and the Administrative Record, the Court AFFIRMS the Decision for the following reasons.

# I. BACKGROUND

The single issue before the AHO was whether DOE violated I.B.'s rights to a "free and appropriate public education" ("FAPE") under the IDEA when it did not provide him registered behavior technician services for a few months and, if so, whether the appropriate remedy for such a violation was placing I.B. in a residential treatment program.  *See* ECF No. 36-15 at 7.  The Court will begin by detailing why I.B. needed these services and how being denied them—which DOE does not dispute—impacted I.B.  It will then turn to the AHO's Decision concluding that no IDEA violation occurred and that, even if one had, a residential treatment program was not the appropriate placement for I.B.

Most of the facts in this appeal are not in dispute.  The Court therefore bases its recitation of the facts primarily on the AHO's Decision.

## A.   I.B.'s Educational Background and Needs

I.B. is eligible for special education and related services under the IDEA and Chapter 60 of the Hawai'i Administrative Rules under the category of Multiple Disabilities including Autism Spectrum Disorder and Intellectual Disability.  ECF No. 36-15 at 7; ECF No. 38-1 at 3.  When the AHO issued the Decision, I.B. was sixteen years old and in the tenth grade.  ECF No. 36-15 at 7.

I.B. has qualified for special education services since kindergarten.  *Id.*  His delays in communication, motor skills, functional skills, social skills, academics,

2

and coping skills impact his ability to participate fully and progress in a general education setting. *Id.* at 8.  In August 2021, I.B. started at Kauai High School. *Id.* at 3, 8.  Shortly after, in October 2021, a Registered Behavior Technician ("RBT") was assigned to work with I.B.—and I.B. only—and provide one-to-one Applied Behavior Analysis ("ABA") services, implement the strategies in I.B.'s behavior intervention plan ("BIP"), and take data on I.B.'s behavior. *Id.*  "ABA is the use of strategies to replace challenging behaviors on a day-to-day basis." *Id.* at 8.  And a BIP is one type of intervention used to provide those ABA services to address behavioral needs, responses to challenging behaviors, and strategies and reinforcement systems to increase communication and social skills. *Id.* at 8–9.  A Board Certified Behavior Analyst frequently observed and supervised I.B.'s RBT, to ensure proper implementation of his BIP. *Id.* at 8, 37.

## B.    I.B's March 9, 2022 IEP

Relevant to this appeal, I.B. had an individualized education program ("IEP") dated March 9, 2022 that provided for these ABA services with a BIP to be implemented by an RBT, as well as one-on-one Individual Instructional Support ("IIS") throughout the school day by an RBT. *Id.* at 9–10.  I.B. was provided one-to-one supervision because of his behavioral problems, issues with paying attention, staying on task, and making good choices, and to keep him safe inside and outside of the classroom. *Id.* at 11.  According to the March 9, 2022 IEP,

I.B.'s least restrictive environment for the rest of ninth grade was to be in a special education setting for six periods, and in the general education setting for one elective class and other non-academic extracurricular activities with supports. *Id.* In tenth grade, I.B. would be in the special education setting for five periods, and in the general education setting for two elective classes and non-academic activities (e.g., lunch, recess, assemblies). *Id.* At the meeting on the March 9, 2022 IEP, the IEP team observed that I.B.'s aggressive behaviors had been minimal so far that school year, although he did have three episodes that required intensive adult support to prevent staff or himself from getting hurt. *Id.* at 11–12.

I.B.'s parents are divorced and, at the time of the March 9, 2022 IEP meeting, shared custody of I.B. *Id.* at 8. At a later meeting intended to help discuss support for I.B.'s family given a rise in his aggression, both parents shared that I.B. had behaved violently in their homes, although I.B.'s father (Hunter Banta, one of the Plaintiffs here) noted that only his spouse had seen the aggression, and only once. *Id.* at 12. After that meeting, I.B.'s special education teacher ("SPED Teacher") and a doctor affiliated with DOE sent I.B.'s father links to DOH services and psychologists on Kauai. *Id.*

C.    **I.B.'s Behavior and Progress at Home and at School**

I.B. had two more aggressive episodes in his freshman year—in May 2022 and June 2022. *Id.* at 12–14. Each episode involved hitting other students or teachers. *Id.* at 13.

In July 2022, I.B.'s mother sent I.B.'s father a note relinquishing physical custody of I.B. *Id.* at 14. A copy of the note was provided to SPED Teacher when I.B.'s father informed her that I.B. would now be living with him full time. *Id.* I.B.'s mother later informed SPED Teacher of the same, explaining that she was unable to control I.B. and was not willing to take any more abuse. *Id.*

In August 2022, I.B. started tenth grade. *Id.* A little over one week later, I.B. came to school sick and had an episode where he hit and head-butted his RBT; after around 45 minutes I.B. calmed down. *Id.* at 15. On August 25, 2022, I.B.'s RBT went on maternity leave and did not return until November 7, 2022. *Id.* The school was not able to find a replacement RBT due to a shortage on Kauai, so other school personnel pitched in to ensure that he always had individual support. *Id.* at 16. For example, another RBT whose assigned student left at noon would assist I.B. after noon, or SPED Teacher or another educational assistant would assist I.B. *Id.* This included SPED Teacher accompanying I.B. to his general education classes, lunch, and recess. *Id.* While I.B.'s RBT was on maternity leave, SPED Teacher and another staff member also kept data on I.B.'s behavior between

5

September 3 and November 4, 2022 (although no data was taken between September 15 and October 18, 2022). *Id.* at 17. His RBT then resumed taking data when she returned from leave in November. *Id.*

On August 30, 2022, I.B. had an aggressive episode, which included slapping and hitting SPED Teacher. *Id.* A security guard and the vice principal had to intervene and I.B. was placed in a hold three separate times before he stopped hitting or trying to hit people. *Id.* at 17–18. I.B.'s father was called to bring him home and I.B. was "crisis removed" from school for three days while a new behavior and crisis plan could be put into place. *Id.* at 18.

On September 26, 2022, I.B. had another aggressive episode, again involving hitting SPED Teacher and other educational assistants. *Id.* at 19. I.B.'s father was again called to pick him up. *Id.* A few days later, on September 29, 2022, I.B. cried at school about going to his mother's house the following week. *Id.* SPED Teacher clarified with I.B.'s mother later, however, that although she wanted to see I.B., there were no plans for him to come over to her house. *Id.* But the day after this, on September 30, 2022, I.B.'s father dropped him off at his mother's house without notice. *Id.* at 19–20. While there, I.B. became aggressive with his mother and his mother's friend; I.B.'s mother called the police and I.B.'s father eventually picked him up. *Id.* at 20.

6

Both of I.B.'s parents separately informed SPED Teacher about this incident with the police.  *Id.*  I.B.'s father also told SPED Teacher that fall break had been difficult with multiple aggressive incidents and that he would be taking I.B. to Mahelona Memorial Center on Kauai after school to get help.  *Id.*  On October 11, 2022, I.B.'s father informed SPED Teacher that I.B. would not be at school because he had been admitted to the hospital the day before due to aggressive behavior, later medevacked to Queen's Medical Center ("QMC") on Oahu, and eventually admitted to QMC's Family Treatment Center.  *Id.*

On October 12, 2022, I.B.'s father told a QMC social worker that I.B.'s aggressive episodes started recently after I.B.'s mother "left," that his spouse was worried about I.B.'s aggression and the safety of the other children in their home, and that he was worried about losing his job.  *Id.* at 20–21.  He also reported that I.B. had hit his mother on the head with a hydroflask, given his father a bloody nose, and that his father needed to hold him down for an hour recently to subdue him.  *Id.* at 21.

On October 13, 2022, I.B.'s mother contacted SPED Teacher asking for information about I.B. because I.B.'s father was not providing any to her.  *Id.* at 21–22.  I.B. was discharged from QMC on October 15, 2022, but Barry S. Carlton, M.D., a psychiatrist at QMC, kept in contact with I.B. and his father to continue to provide I.B. care.  *Id.*

On November 3, 2022, I.B. had another aggressive episode, and again hit SPED Teacher and an education assistant, although he calmed down within five minutes with help from a Board Certified Behavioral Analyst ("BCBA"). *Id.* at 24. I.B.'s father was called, and came to the school, but questioned why I.B. was always sent home for aggressive episodes. *Id.* SPED Teacher consulted with I.B.'s father, BCBA, and the school administration before deciding that I.B. should remain at school because he had calmed down. *Id.* SPED Teacher later informed I.B.'s mother about this incident and told her that they would make a decision on a case-by-case basis about whether to keep I.B. at school or send him home for an aggressive episode. *Id.* at 24–25.

On November 7, 2022, I.B.'s RBT returned from maternity leave. *Id.* On November 13, 2022, I.B.'s father spoke with SPED Teacher about wanting to call an IEP meeting to discuss sending I.B. to a residential treatment facility. An IEP meeting was scheduled for December 2, 2022. *Id.* at 25–26. At the end of November, I.B.'s father informed SPED Teacher that I.B. had some recent aggressive episodes at home and, on November 29, 2022, Dr. Carlton wrote a letter recommending that I.B. be placed in a residential treatment facility due to an increase in violence against his family, but acknowledging that I.B. had only partially responded to medication management. *Id.* at 26–27. Dr. Carlton's letter indicated that placement at such a facility could attempt to ameliorate I.B.'s

8

violence; however, Dr. Carlton did not review I.B.'s educational records or speak with any DOE personnel before or after writing that letter. *Id.* at 27.

**D.     December 2022 IEP Meetings and Subsequent Developments**

At the December 2, 2022 IEP meeting, I.B.'s least restrictive environment was discussed. *Id.* His father brought up concerns about his aggression. *Id.* The IEP team looked at the data about I.B.'s progress with his current LRE and revised his IEP to include School Based Behavioral Health ("SBBH") Teacher Consult Services and "BCBA Parent Consult Services" to help transfer the skills I.B. learned at school to home, and to provide in-home visits to help I.B.'s parents and family fill the gap between home and school. *Id.* at 27–28. Otherwise, the December 2, 2022 IEP remained unchanged from the March 9, 2022 IEP, meaning the team declined to put I.B. in a residential treatment facility because they needed to analyze his records before making a determination about placement. *Id.* at 28–29. I.B.'s father had his first BCBA Parent Consult Services meeting on December 6, 2022, discussing topics like de-escalation strategies and physical holds. *Id.* at 29.

The IEP team met again on December 8, 2022 to discuss its review of the data and records; no changes were made to the IEP, and again the team declined to place I.B. in a residential treatment facility. *Id.* The IEP team did still recognize that I.B.'s behavior at home could be more challenging than his behavior at school

and noted efforts undertaken to provide his family with access to public and private services to support I.B. and his family.  *Id.* at 29–30.

A few days later, on December 12, 2022, I.B. again showed aggression at school, hitting a student and kicking another, although each time was able to calm down pretty quickly.  *Id.* at 30–31.  I.B. was also sick that day, so his father was called to pick him up.  *Id.*  Two days later, I.B. was still sick but came to school; his father was called and initially refused to pick him up, telling the school to call I.B.'s mother.  *Id.* at 31.  I.B.'s mother informed the school she could not physically handle I.B., so his father eventually came.  *Id.*

On January 4, 2023, I.B.'s mother let SPED Teacher know that she was stepping back from contact with I.B.  She described tension between her and I.B.'s father when she went to see I.B. on Christmas morning, reporting that I.B. was happy to see her but that I.B.'s father was yelling and swearing at her the entire time.  *Id.* at 31–32.

I.B.'s father was supposed to have another BCBA Parent Consult Services meeting on January 10, 2023, but he had to cancel.  *Id.* at 32.  On January 13, 2023, the IEP team met again to discuss I.B.'s extended school year services and his father's desire for a re-evaluation and continued desire that I.B. be placed in a residential treatment facility.  *Id.* at 32.  The January 13, 2023 IEP is largely the same as the December 8, 2022 IEP, although it contains more information from

10

I.B.'s father.  *Id.*  But I.B.'s father did not inform the IEP team at that time that Dr. Carlton was I.B.'s treating psychiatrist.  *Id.* at 33.  The week after that IEP meeting, Plaintiffs requested an impartial due process hearing.  *Id.*

In the meantime, BCBA and I.B.'s father had a BCBA Parent Consult Services meeting in early February 2023 where they identified I.B.'s triggers (events likely to cause certain behaviors) and precursors (signals indicating his behavior might escalate) and reviewed I.B.'s BIP.  *Id.*  I.B. also had a number of aggressive episodes at school that month.  *See id.*  On February 9, 2023, I.B. attempted to hit a peer and a teacher with a newspaper, but was able to calm down after thirty-five minutes with the use of certain strategies.  *Id.*  Later that month I.B. became frustrated after a school field trip was canceled due to rain and he hit SPED Teacher on the arm, although was able to calm down.  *Id.*  That same day he hit another student and himself, although again was able to calm down, and later elbowed and attempted to chest bump another student, yet still was able to calm down after that incident.  *See id.* at 33–34.

In early March 2023, Arthur Brownstein, M.D., I.B.'s primary care physician who saw I.B. between July or August 2022 and November 2022, wrote a letter agreeing with Dr. Carlton's recommendation that I.B. should be enrolled in a residential treatment facility.  *Id.* at 34.  At the time of the Decision, Dr. Carlton was monitoring I.B.'s medication and saw I.B. more than Dr. Brownstein did.  *See*

*id.*  Dr. Brownstein's letter noted that I.B. was prone to increasing angry outbursts, and that he harmed people at home and at school, which has "further alienated [I.B.] from the proper medical, social, and behavioral health care [I.B.] needs to learn—in order to help [I.B.] cope with [his] congenital disabilities."  *Id.* (citation omitted).  I.B.'s father, however, did not share I.B.'s educational records with Dr. Brownstein.  *Id.*

On March 14, 2023, I.B.'s father took him to Wilcox Medical Center on Kauai because he was becoming aggressive with his siblings and needed to be restrained to keep him from harming himself or others.  *Id.*  He was again medevacked to QMC, where he saw Dr. Carlton.  *Id.* at 34–35.

**E.     March 2023 Due Process Hearing**

The due process hearing took place on March 21 and 22, 2023.  *Id.* at 5. I.B.'s father and Dr. Carlton testified on behalf of Plaintiffs.  *Id.* at 6.  DOE called I.B.'s RBT, BCBA, and SPED Teacher as witnesses.  *Id.*

The AHO admitted evidence regarding I.B.'s progress at school that specifically addressed the goals and objectives in his March 9, 2022 IEP and showed he made "steady progress" overall toward those goals.  *Id.* at 35.  In the first quarter of 2022 (August 2022 to fall break in October 2022), I.B. was "emerging" (meaning making little progress) or "progressing" (meaning making a lot of progress, but not yet mastering) toward his goals.  *Id.*  In the second quarter

12

of the school year (fall break to winter break), I.B. again made a lot of progress toward his March 9, 2022 IEP goals.  *Id.*  And during the third quarter (after winter break until March 2023), he mastered most of the goals in his IEP.  *Id.*

Evidence was also admitted regarding the percentage of time I.B. was aggressive during a school day on average.  *Id.* at 35.  From November 11 to December 16, 2022, he engaged in aggression on average for only about 2% of the day.  *Id.*  From January 4 to March 9, 2023, that average decreased to 1% of the day.  *Id.* at 36.  Across both periods, I.B. committed self-injurious acts on average for only 0.15% or less of the school day.  *Id.*

At the hearing, BCBA testified that I.B. was showing progress with his behavioral skills at school and that, based on the data, could continue to receive his educational services in his current high school classroom setting.  *Id.*  SPED Teacher's testimony echoed this sentiment—noting I.B. was able to attend general education classes, enjoyed being around his peers, was making academic progress, and had shown improvement in both his behavior and coping skills.  *Id.*  SPED Teacher specifically testified she did not believe I.B. belonged in a residential treatment facility.  *Id.*

**F.     The AHO's Decision**

The AHO identified the following as the issue for determination in the due process hearing, based on Plaintiffs' due process complaint:

13

>    Whether Student was denied a FAPE when Student was not
>    provided RBT services and as a consequence it is necessary to
>    place Student in a residential treatment program.

*Id.* at 42.  Neither party disagreed with that characterization of the issue before the

AHO.  *See* ECF No. 36-5 at 3; ECF No. 40 at 7.  As will be discussed in more

detail below, the AHO ultimately concluded DOE had failed to implement I.B.'s

March 9, 2022 IEP while I.B.'s RBT was on maternity leave because he did not

have a dedicated RBT replacement (meaning he was not provided RBT services as

required).  *See* ECF No. 36-15 at 42.  But the AHO also concluded that this did not

amount to a material failure to implement his IEP, and therefore did not amount to

the denial of a FAPE.  *See id.* at 42–46.  Even assuming a material failure, though,

the AHO concluded that placement in a residential treatment facility would not

have been the appropriate remedy, essentially concluding that I.B.'s aggressive

outbursts, which appeared to be connected more to issues at home as compared to a

lack of a dedicated RBT for a certain period, did not impede his ability to receive

educational services or make progress in his current educational setting.  *Id.* at 46–

51.  And the AHO then concluded that, even if she considered issues related to

I.B.'s mental health services and discrimination allegations that were not properly

before her (based on what was in Plaintiffs' due process complaint), none

warranted relief in Plaintiffs' favor.  *Id.* at 51–53.

**G.     Proceedings in Federal Court**

Plaintiffs then initiated this action in federal court with the filing of a

Complaint in May 2023.  ECF No. 1.  DOE moved to dismiss the Complaint, ECF

No. 12, which DOH joined, ECF No. 16, although the parties later stipulated that

those motions would be withdrawn and Plaintiffs would be permitted to file an

amended pleading, ECF No. 19.  Plaintiffs then filed their First Amended

Complaint, which both appeals the AHO's Decision below, but also purports to

bring separate claims under federal law under Section 504 of the Rehabilitation

Act and Section 1983.  ECF No. 21.  A briefing schedule was set to resolve the

IDEA appeal portion of this suit, with a trial date and deadlines also set in the

event these were necessary based upon how the Court resolved the IDEA appeal

portion of the case.  *See* ECF Nos. 42–44.  Plaintiffs filed their opening brief on

February 5, 2024.  ECF No. 47.  DOH and DOE filed their respective answering

briefs on March 21, 2024.  ECF Nos. 48–49.  Plaintiffs filed their reply brief on

April 4, 2024.  ECF No. 50.  The Court held oral argument on this briefing on

April 26, 2024.  ECF No. 52.

## II.  LEGAL STANDARD

The IDEA provides that a court, in reviewing a decision following a due

process hearing, "(i) shall receive the records of the administrative proceedings;

(ii) shall hear additional evidence at the request of a party; and (iii) basing its

decision on the preponderance of the evidence, shall grant relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Instead, the Court must give "due weight" to the administrative proceedings. *Id.*; *see L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 908 (9th Cir. 2009).

The Court must therefore carefully consider the agency's findings and "endeavor to respond to the hearing officer's resolution of each material issue." *L.M.*, 556 F.3d at 908 (internal quotation marks and citation omitted). Moreover, the Court may not simply ignore the administrative findings even though it may independently determine how much weight to give to the same. *See id.* Greater deference is accorded to "'thorough and careful'" administrative agency findings. *Id.* (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)). The Court is to give deference to a hearing officer's decision "when it 'evinces his [or her] careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented.'" *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438–39 (9th

16

Cir. 2010) (quoting *County of San Diego v. Cal. Special Educ. Hearing Off.*, 93

F.3d 1458, 1466 (9th Cir. 1996)) (internal quotation marks omitted) (alterations in

original).

The burden of proof in IDEA appeals rests with the party challenging the

administrative decision.  *See Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099,

1103 (9th Cir. 2007).

## III.  DISCUSSION

**A.     Impartiality of AHO**

Before turning to the merits of Plaintiffs' claims on appeal, the Court

addresses whether the proceedings below were impacted by alleged bias on the

part of the decisionmaker, the AHO.  Plaintiffs briefly suggest that they did not

receive an impartial due process hearing as required under the IDEA because the

AHO "actually is an employee of the State of Hawaii Attorney General's Office

and reports to the very same Attorney General who represents and advises the state

agencies in this case."  ECF No. 47 at 4; *see also id.* at 5 (again stating only that

the AHO "is an employee of the same Office of the Attorney General and is not an

entirely neutral or unbiased decision maker in such educational due process

hearings").  Nothing further is offered on this point.  DOE responds by noting that

the assigned AHO issued a letter advising the parties of her appointment, reporting

that she had "no personal, professional, or financial relationship with either party

in this matter that would affect [her] ability to render an impartial decision" and that if counsel had any questions or concerns they should advise her immediately, but that Plaintiffs' counsel never did so below. *See* ECF No. 49 at 6 (quoting ECF No. 36-2 at 2).

Plaintiffs base their allegation of bias solely on the fact that the AHO works out of the Office of Dispute Resolution, which is part of the Department of the Attorney General. But they fail to explain how this fact alone means the AHO in this case was biased—nor why they should be permitted to raise this issue here when they did not raise it below.

The IDEA provides that a hearing officer shall not be:

> (I) an employee of the State educational agency or the local educational agency involved in the education or care of the child; or
> (II) a person having a personal or professional interest that conflicts with the person's objectivity in the hearing;

20 U.S.C. § 1415(f)(3)(A)(i). So, while a hearing officer may not be an employee of DOE, there is no bar on the organizational structure here, where the office designated to conduct impartial due process hearings in Hawai'i and the lawyers defending the DOE in those hearings both fall within the Department of the Attorney General. Nor have Plaintiffs made any effort to demonstrate that this organizational structure creates a per se personal or professional conflict of interest that might impair a hearing officer's objectivity. And, as evident from the

discussion below, the Court detects no evidence of bias in the AHO's Decision here; instead, "[b]oth parties' submissions and testimony were weighed, and the officer's decision was well-reasoned and balanced." *D.R. ex rel. Etsuko R. v. Dep't of Educ., Hawaiʻi*, 827 F. Supp. 2d 1161, 1166 (D. Haw. 2011) (rejecting argument that a hearing officer was biased because he previously represented the DOE as a Deputy Attorney General or because his former co-worker represented the DOE in the hearing at issue).

At the hearing, Plaintiffs conceded that they had not raised this issue of bias below. And, more importantly, they further conceded that this case was not the appropriate vehicle to challenge this aspect of Hawaii's organizational structure with regard to IDEA hearings. For all of these reasons, the Court concludes that Plaintiffs are not entitled to any relief on these grounds.

## B.    Denial of FAPE

To frame the other issues raised in this appeal, it is worth noting what the IDEA does: it offers federal funds to States so long as they furnish a FAPE to children with certain disabilities. *See* 20 U.S.C. §§ 1401(3)(A)(i), 1412(a)(1)(A). A FAPE includes "special education and related services," meaning both instruction tailored to meet a child's "unique needs" and sufficient supportive services to permit the child to benefit from that instruction. *Id.* §§ 1401(9), (26), (29). The Supreme Court has summarized how a FAPE is achieved as follows:

> Under the IDEA, an "individualized education program," called
> an IEP for short, serves as the primary vehicle for providing each
> child with the promised FAPE. (Welcome to—and apologies
> for—the acronymic world of federal legislation.)  Crafted by a
> child's "IEP Team"—a group of school officials, teachers, and
> parents—the IEP spells out a personalized plan to meet all of the
> child's educational needs.  Most notably, the IEP documents the
> child's current levels of academic achievement, specifies
> measurable annual goals for how she can make progress in the
> general education curriculum, and lists the special education and
> related services to be provided so that she can advance
> appropriately toward those goals.

*Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158–59 (2017) (internal quotation

marks, citations, and alteration omitted).  Plaintiffs mostly challenge whether DOE

complied with I.B.'s March 9, 2022 IEP, so the Court focuses its attention there.

In doing so, the Court affords greater deference to the Decision on these topics

because of the AHO's careful and thorough findings.  *See L.M.*, 556 F.3d at 908.

### 1.   Failure To Implement IEP With Regard to RBT Services

The AHO concluded DOE failed to implement I.B.'s March 9, 2022 IEP

because, while his RBT was on maternity leave between August and November

2022, DOE failed to provide I.B. individual instructional support from an RBT for

the entire school day.  ECF No. 36-15 at 42.  But she also concluded this failure

was not material, noting I.B. had individualized support during this time, including

at times from other RBTs (albeit not always from an RBT as required).  *See id.* at

44–46.  The AHO found it probative that I.B. continued to make progress towards

his educational goals during this time, and that this time did not coincide with an

20

increase in aggressive episodes. *See id.*  While she recognized that I.B. did have

three aggressive episodes during this time period, the AHO also noted there was no

evidence that his RBT's absence was the cause of those incidents, as opposed to

other life events such as not being able to live with his mother. *See id.* at 44–46.

It is not entirely clear whether Plaintiffs contend the AHO erred with regard

to these findings.  In their opening brief, Plaintiffs note that the absence of I.B.'s

RBT was "to the clear detriment of I.B.'s needs," that "[t]he hearing officer simply

dismissed that failure [to provide an RBT] as 'a minor discrepancy' that is 'not

material'" and that "[a]pparently it also was immaterial that during the fall

semester in 2022 I.B.'s behaviors deteriorated so much that he had to be

transferred from a local hospital on Kauai to the Queens Medical Center where he

received emergency mental health care in the Family Treatment Center until he

could be stabilized and returned home."  ECF No. 47 at 6.  To the extent Plaintiffs

are arguing that the AHO erred in finding no materiality because I.B. was

hospitalized, they have failed to carry their burden.

As the AHO noted, the IDEA is violated only if DOE "is shown to have

materially failed to implement the child's IEP."  *Van Duyn v. Baker Sch. Dist. 5J*,

502 F.3d 811, 815 (9th Cir. 2007).  Elaborating further, the Ninth Circuit stated in

*Van Duyn*, which the AHO also cited, that

> [a] material failure occurs when there is more than a minor
> discrepancy between the services a school provides to a disabled

child and the services required by the child's IEP . . . . [W]e
clarify that the materiality standard does not require that the child
suffer demonstrable educational harm in order to prevail.
However, the child's educational progress, or lack of it, may be
probative of whether there has been more than a minor shortfall
in the services provided.  For instance, if the child is not provided
the reading instruction called for and there is a shortfall in the
child's reading achievement, that would certainly tend to show
that the failure to implement the IEP was material.  On the other
hand, if the child performed at or above the anticipated level, that
would tend to show that the shortfall in instruction was not
material.   We also emphasize that nothing in this opinion
weakens schools' obligation to provide services "in conformity
with" children's IEPs. § 1401(9).  IEPs are clearly binding under
the IDEA, and the proper course for a school that wishes to make
material changes to an IEP is to reconvene the IEP team pursuant
to the statute—not to decide on its own no longer to implement
part or all of the IEP.  *See* §§ 1414(d)(3)(F), 1415(b)(3).

*Id.* at 822.  Once it became apparent that I.B.'s RBT would be on leave and that

finding a replacement on Kauai would prove challenging, the preferred course

would have been to reconvene the IEP team.  Still, Plaintiffs have not shown that

failing to do so here amounted to a violation of the IDEA.  They do not offer any

argument or evidence that the AHO erred when she relied on evidence that I.B.

continued to make academic progress during this time.  Nor do they suggest the

AHO should not have relied on a lack of evidence that any aggressive episodes at

school during this time were the result of the failure to provide RBT services as

opposed to issues with I.B.'s home life.  Indeed, I.B. was admitted to QMC after

fall break, which his father noted had been a "rough [time] at home" with I.B.

experiencing multiple episodes of aggression.  ECF No. 36-15 at 20.  This

occurred less than two weeks after I.B.'s father dropped him off at his mother's home unannounced (despite her statement she was giving up physical custody of I.B.), resulting in I.B. acting out aggressively within two hours of arrival, causing I.B.'s mother to call the police. *See id.* at 14, 19–21.  While Plaintiffs attempt to vaguely suggest a material failure by pointing to his hospitalization, I.B.'s father himself confirmed with social workers at QMC after I.B.'s admission that the aggression started after I.B.'s mother "left"—rather than tracing it to the absence of certain RBT services at school.  *See id.* at 20–21.  And there was no evidence that his aggressive behaviors at school increased during the RBT's maternity leave in any event.  Plaintiffs have therefore not met their burden of demonstrating that the AHO erred when she determined there was no material failure to implement I.B.'s IEP.

## 2.   Failure to Order Placement In Residential Treatment Facility

The AHO also addressed Plaintiffs' argument below that I.B. was denied a FAPE based on the lack of RBT services, and should therefore be placed in a residential treatment facility.  Even assuming a material failure to implement I.B.'s March 9, 2022 IEP (which the AHO did not find, and this Court has just affirmed), the AHO concluded that Plaintiffs had not demonstrated that placement at a residential treatment facility would be the appropriate remedy.  ECF No. 36-15 at 46–47.

23

"[T]he IDEA does not . . . require [school districts] to address all of [a student's] medical concerns." *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1185 (9th Cir. 2009)  (citing 34 C.F.R. § 300.104).  When a court is presented with an argument that a student should have been provided a residential placement, its "analysis must focus on whether the residential placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Id.* (alteration, quotation, and citation omitted).

Here, the AHO concluded placement at a residential treatment facility was not necessary for educational purposes, i.e., that I.B. did *not* need to be at such a facility to have his educational needs met.  *Id.* at 47.  She based this finding on the fact that I.B. was making progress toward his academic goals while his RBT was on leave, that both his SPED Teacher and BCBA opined his educational needs could be met in the current school setting, and that there was not necessarily a comparative increase in aggressive outbreaks during his RBT's leave—or at least no evidence the outbreaks during that time were connected to the RBT's absence. *Id.* at 47.

In their opening brief, Plaintiffs mention residential treatment once, stating only:

> At the March, 2023, hearing Plaintiff presented undisputed and detailed evidence about the long term existence and

> manifestations of I.B.'s disabilities, including evidence from two
> doctors who have diagnosed and treated I.B.   The most
> significant testimony came from Dr. Barry Carlton, a highly
> respected pediatric psychiatrist, *who recommended that I.B. be*
> *placed into a residential setting where all of his services and*
> *programs can be provided consistently by persons who are*
> *specially trained and capable of working with children with the*
> *kinds of disabilities that I.B. presents.*

ECF No. 47 at 4 (emphasis added).  As far as the Court can gather, Plaintiffs'

argument is that the AHO erred in this respect because she relied on the

"subjective" testimony of people like I.B.'s SPED Teacher and BCBA, rather than

"objective" testimony from medical professionals like Dr. Carlton.  *See id.* at 4–5.

That argument misses the mark.  Medical opinions can also be subjective—for

example, the opinion that I.B. would benefit from placement in a residential

treatment facility.  *See* ECF No. 37-1.  And there was objective data on the

minimal amount of time that I.B. was either acting aggressively or self-harming at

school, which supported the non-medical opinions that I.B. should remain at

school, on which the AHO relied.  *See* ECF No. 36-15 at 35–36.

Even putting that aside and assuming the SPED Teacher and BCBA

provided mere subjective testimony contrary to that of medical professionals,

Plaintiffs have not demonstrated that the AHO erred in giving more weight to that

testimony.  The Ninth Circuit has recognized that a hearing officer "who receives

live testimony is in the best position to determine issues of credibility."  *Amanda J.*

*ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001).

Specifically, "credibility-based findings [of the hearing officer] deserve deference unless non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Id.* (citation omitted).  And as already noted above, the Court affords the AHO's findings greater deference here because of her careful and thorough consideration of the evidence.  *See J.W.*, 626 F.3d at 438.  Based on this, Plaintiffs have not shown that the AHO was wrong to afford certain testimony more weight, or that it would be wrong for the Court to defer to those findings.

The AHO compared, for example, the SPED Teacher's experience with I.B. dating back to when he was a fifth grader, and noted that SPED Teacher was often on the receiving end of I.B.'s aggression (and so may have a self-serving reason to recommend placement at a residential treatment facility and thus outside her classroom), yet still testified credibly that his educational needs could be met in the current school setting.  ECF No. 36-15 at 47–48.  The AHO then compared this testimony to that of Drs. Carlton and Brownstein whose opinions, although credible, were ultimately afforded less weight compared to that of SPED Teacher because those doctors had not known I.B. for as long and did not review I.B.'s educational records or speak with anyone at DOE about I.B.  *Id.* at 48.  The AHO further noted that Dr. Carlton's testimony indicated that I.B.'s aggression was mainly toward his family—which was supported by the evidence in the record that

I.B.'s aggressive episodes were more uncontrollable at home rather than at school. *Id.* at 49.  The AHO also noted the "discord in the family" could, logically and understandably, negatively affect I.B.  *Id.*  Indeed, I.B.'s two hospitalizations occurred when he was at home more, either during or immediately after an extended break from school—the first occurring after fall break and the second occurring during spring break.  *See id.* at 17, 20, 34–35, 36 n.14.  So the AHO ultimately concluded the request for placement at a residential treatment facility was based on a response to medical, social, or emotional problems—not ones related to the learning process that would make placement at a residential treatment facility necessary under the IDEA.  *See id.* at 49.

The AHO underscored this conclusion when discussing I.B.'s least restrictive environment, noting that he was able to spend more time in a general education setting in tenth grade as compared to the ninth grade,  and so she would not second-guess the SPED Teacher and BCBA's unrebutted opinions that he was making meaningful academic progress within this LRE.  *Id.* at 50.  As the AHO succinctly put it: "[Plaintiffs] did not show that [I.B.'s] struggles outside of school prevented [him] from making educational progress in school."  *Id.* at 50–51.

Plaintiffs spend much of their reply repeating that I.B. has emotional disabilities and that doctors testified that I.B. should receive mental health services in a residential treatment setting.  *See, e.g.*, ECF No. 50 at 2, 5.  But they offer no

specific argument as to why the AHO erred in concluding that, despite these issues, I.B. was making progress at school and that, although a placement may have been necessary for medical or emotional issues, these issues were not impeding I.B.'s ability to benefit from the education he was receiving in his current school setting. There are certainly examples in the record where I.B. had to leave school due to aggressive outbursts, *see, e.g.*, ECF No. 36-15 at 17–18 (discussing crisis removal in late August 2022 for period of three days), or where I.B. had to miss school when hospitalized in connection with aggressive episodes or triggering incidents arising at home. *See id.* at 20, 34. But Plaintiffs have still not pointed the Court to any evidence refuting the AHO's ultimate finding—based on the testimony of those who, although not medical professionals, were the educational professionals that spent the most time with I.B. at school—that I.B. was making the progress he needed to be making as set forth in his IEP, including with regard to behavioral skills, all the while increasing the amount of time he spent in a general education setting. The Court therefore concludes Plaintiffs have not met their burden on this issue either. *See Ashland*, 587 F.3d at 1185 (declining to "conclude that the district court committed clear error in finding that the residential placement was necessitated by medical, rather than educational, needs" when student had been hospitalized for threatening classmates and relatives, and parents testified placement was related to problems at home rather than at school).

28

### 3.    Failure to Provide Mental Health Services

In a related vein, Plaintiffs now claim they are entitled to relief because I.B.'s IEP failed to adequately account for I.B.'s mental health needs or provide necessary mental health services.  *See* ECF No. 47 at 3.  When Plaintiffs raised these issues at the due process hearing below, the AHO concluded they were not properly before her.  *See* ECF No. 36-15 at 51.  The Court agrees, as there is no mention of inadequate mental health services (nor Plaintiffs "begging" DOH to be involved in I.B.'s IEP meetings) in Plaintiffs' underlying due process complaint,[1] *see* ECF No. 36-1, nor any reason that would otherwise permit Plaintiffs to raise them for the first time on appeal here.  *See Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1465 (9th Cir. 1996) ("The scope of the administrative hearing mandated by [former] section 1415(b)(2) is limited to the 'complaint' raised to obtain the hearing."); *N.D. v. Hawaii Dep't of Educ.*, 600 F.3d 1104, 1110 (9th Cir. 2010) (addressing limited exceptions to exhaustion required under the IDEA).  Indeed, in response to DOE's argument that this issue

---

[1]  Plaintiffs did not cite any evidence to support the contention that they repeatedly asked for DOH to be part of I.B.'s IEP team.  *See* ECF No. 47 at 3.  At the hearing, Plaintiffs' counsel further claimed that, during the due process hearing, I.B.'s father testified that he reached out to DOH, but DOH was not interested in providing services to I.B.  No record cites were provided, and it is unclear what testimony counsel was referring to.  The Court is only aware of the application I.B.'s father submitted to DOH *after* the due process hearing in March 2023, which prompted DOH to provide mental health services to I.B. beginning in April 2023.  *See* ECF No. 48-1.

is not properly before the Court, Plaintiffs have not offered any real response—noting only that the AHO addressed the request for placement at a residential treatment facility. *See* ECF No. 50 at 3. But that is different from the issue of the nature and scope of mental health services provided for in I.B.'s IEP and DOH's involvement in providing any such services, which Plaintiffs also discuss in their briefing here. *See, e.g.*, ECF No. 47 at 3.

Even if the issue were properly before the Court, it would conclude Plaintiffs have failed to demonstrate any error related to the mental health services provided to I.B. As the AHO noted, Plaintiffs failed to articulate what was missing from I.B.'s IEPs with regard to mental health services. ECF No. 36-15 at 51–52. The AHO detailed the services that I.B.'s IEPs *did* provide: ABA services, IIS by an RBT, a BIP and crisis response plan—which together were intended to address issues like I.B.'s self-regulation, functional independence, and dangerous behaviors like elopement and aggression. *Id.* at 52. The AHO also detailed how later IEPs provided SBBH Teacher Consult Services and BCBA Parent Consult Services that, although not provided directly to I.B., were intended to assist him with these very issues by better equipping his parents and teachers when dangerous behaviors arose either at home or at school. *See id.* The AHO therefore "decline[d] to guess what type of mental health services should have been in [I.B.]'s IEP but was not." *Id.*

On appeal, Plaintiffs still fail to articulate what mental health services were missing, aside from again arguing in favor of placement at a residential treatment facility.  Nor do Plaintiffs, for example, offer any specific argument contending that the services the AHO identified in I.B.'s various IEPs are either not mental health services or were inadequate to address his mental health needs, aside from noting the instances where I.B. was hospitalized after his aggression escalated at home.  Instead, Plaintiffs' reply brief raises yet more new issues—seeming to argue that because I.B. was hospitalized again, and then required to stay in a hospital setting for longer than necessary before being "moved into a specially created therapeutic foster home on the Island of Oahu," ECF No. 50 at 2–3, all of this is somehow proof that the AHO previously erred when she concluded he did not need to be placed in a residential treatment facility or that DOE was doing enough to address I.B.'s mental health needs.  The Court will not address these arguments that were both not raised below and only raised here in a conclusory fashion in a reply brief.  *See A.G. v. Hawaii*, 2015 WL 3822309, at *5 (D. Haw. June 19, 2015).[2]

---

[2]  In mentioning that I.B. is now in a therapeutic foster home, Plaintiffs anticipated that DOE or DOH may attempt to argue that certain issues are now moot "since I.B. is, indeed, receiving the precise care that was sought in the administrative proceedings."  ECF No. 50 at 3.  Plaintiffs contend that the issues on appeal are not moot, however, because they may still be entitled to damages for the delay in I.B. being provided the care and treatment he was entitled to under the IDEA.  *See* ECF No. 50 at 4 (citing *Mark H. vs. Lemahieu*, 513 F.3d 922 (9th Cir. 2008), which

Overall, then, the Court agrees that Plaintiffs' issues with DOH's lack of involvement in developing I.B.'s IEPs and general argument regarding insufficient mental health services are not properly before the Court. But even if they were, Plaintiffs have still failed to develop a cogent argument with support in either the record or citation to authority showing why they are entitled to relief.

## C.     Rehabilitation Act Claim

On appeal, Plaintiffs make no mention of the Rehabilitation Act or any claim of discrimination in their opening brief, stating only in a single sentence in their reply brief that they want the Court to reverse and vacate the AHO's Decision "and allow Plaintiff to proceed to trial, as scheduled, on his Section 504 damages." ECF No. 50 at 6. Plaintiffs conceded at the hearing that affirming the AHO's Decision means they have no viable claim under the Rehabilitation Act. *Cf. K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) ("Because a school district's provision of a FAPE under the IDEA meets Section 504 FAPE requirements, a claim predicated on finding a violation of the Section 504 FAPE

---

discusses the ability to recover damages under the Rehabilitation Act when a FAPE is denied, provided a plaintiff also establishes certain other elements, e.g., that they were denied access to a public benefit and the defendant organization acted with deliberate indifference). At the hearing, neither DOE nor DOH asked the Court to refrain from reviewing the AHO's Decision based on concerns with mootness.

standard will fail if the IDEA FAPE requirement has been met."). The Court agrees, and because it affirms the AHO's decision, no viable claims remain.[3]

**D.    Administrative Exhaustion Against DOH**

Finally, DOH also separately contends in their answering brief that, while the Court should affirm the AHO's Decision on the merits, Plaintiffs are not entitled to relief against DOH in any event because DOE is the entity responsible for providing I.B. a FAPE, DOH was not involved in the proceedings below and did not begin to provide services to I.B. until after the due process hearing in April 2023, and Plaintiffs have failed to exhaust their administrative remedies against DOH for their claims that are premised on an alleged denial of a FAPE. *See* ECF No. 48 at 12–17. Plaintiffs' reply offers no illuminating response to DOH's arguments on these points. *See* ECF No. 50 at 5–6.

Subject to limited exceptions, "[t]he IDEA's exhaustion requirement applies in cases where the plaintiff seeks a remedy for failure to provide a FAPE." *Student*

---

[3] The AHO noted that Plaintiffs' allegation of discrimination in violation of Section 504 of the Rehabilitation Act (which also was not in the underlying due process complaint) was also not properly before her, but in any event concluded it was similarly without merit because there was no evidence of discrimination. *See* ECF No. 36-15 at 51–53. Indeed, the AHO found that SPED Teacher—who primarily interacted with I.B.'s parents—was respectful, responsive, and professional, and that the IEP team fairly evaluated I.B.'s father's request for a residential treatment facility placement, but ultimately decided it was not necessary for I.B. *See id.*

*A ex rel. Parent A v. San Francisco Unified Sch. Dist.*, 9 F.4th 1079, 1083 (9th Cir. 2021) (citing 20 U.S.C. § 1415(i)(2)(A), (l)).  As previously noted, Plaintiffs' due process complaint made no mention of DOH.  And DOH was not a party to the proceedings below.  Plaintiffs also do not dispute DOH's contention that the gravamen of this action is the alleged denial of a FAPE—meaning the IDEA's exhaustion requirements must be met.  *See* ECF No. 48 at 14.  Nor do they offer any coherent argument in their briefing that, for example, exhaustion here would be futile or should otherwise be excused.  *See, e.g.*, *Student A by & through Parent A v. San Francisco Unified Sch. Dist.*, 9 F.4th 1079, 1083 (9th Cir. 2021) (noting "IDEA's exhaustion requirement applies in cases where the plaintiff seeks a remedy for failure to provide a FAPE" and affirming district court's dismissal for failure to exhaust when plaintiffs challenged "failures in practice" rather than any policy or practice of general applicability).  Plainly, then, Plaintiffs have not shown why they are entitled to any relief against DOH here, whether premised on reversal of the AHO's Decision or separate claims, e.g., under the Rehabilitation Act, predicated on the theory that I.B. was denied a FAPE.  *See Shores v. Hayashi*, CV No. 22-00520-JAO-WRP (D. Haw. Mar. 7, 2024) (concluding plaintiffs in that action, represented by the same counsel as Plaintiffs here, failed to exhaust administrative remedies against DOH where DOH was also not involved in proceedings below and plaintiffs sought remedies for denial of a FAPE).

34

At the hearing, Plaintiffs' counsel articulated—for the first time—the theory that DOH is a proper defendant at this stage (notwithstanding their absence below) because it was not possible for Plaintiffs to name DOH as a respondent in the due process complaint or otherwise involve DOH in the due process hearing.  In general, any argument raised for the first time at a hearing is waived.  *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016).  Regardless, because the Court affirms that I.B. was not denied a FAPE, and Plaintiffs' claims rise and fall with that determination, the Court need not resolve the issue regarding DOH as an appropriate party here.  It does note, however, that Plaintiffs' counsel again appears to be attempting to use this case as a vehicle to challenge issues not before the Court.  Ultimately, Plaintiffs' counsel takes issue with the fact that, in this case, DOH was not part of I.B.'s IEP team.  But, again, that was not the issue presented to the AHO.  Plaintiffs' counsel has also made clear that he views the lack of residential treatment facilities in Hawaiʻi as a systemic issue.  But that too is not the issue before the Court, which is instead only called to address—as Plaintiffs' counsel himself conceded—whether I.B. was denied a FAPE when his RBT went on maternity leave and he was not placed in a residential treatment facility.  Because the Court agrees with the AHO's determination on those issues, relief against DOH is not warranted.

35

## IV. CONCLUSION

For the reasons set forth above, the Court AFFIRMS the AHO's Decision.

The Clerk is directed to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, April 30, 2024.

Jill A. Otake
United States District Judge

CIV. NO. 23-00222 JAO-WRP, *Hunter Banta, Individually and on behalf of his minor son, I.B., v. Keith Hayashi, et al.*; ORDER AFFIRMING ADMINISTRATIVE HEARING OFFICER'S DECISION